May it please the Court, I'm Erin Wosley on behalf of Appellant Gregory Dillon and I will be addressing specifically the underlying discrimination claim in this case. How have you arranged to split your ten minute time? There are three names on my list. I am planning to speak first addressing the retaliation discrimination claim for the first three to four minutes. My co-counsel Serena DeGrasa will be arguing addressing the performance appraisal issue for the next three to four minutes and then Arun Rao will be doing a two minute rebuttal permitting. So you need to be careful not to exceed eight minutes between the two of you so you probably have four each more or less. All right well we'll try to accommodate your plan that doesn't always work but we'll make a good effort. You may proceed please. We are third-year law students from the University of Arizona. We're here as part of the Ninth Circuit's pro bono clinic and our advisor is Dr. who was discriminated against and then denied his day in court. This case is inappropriate for summary judgment because genuine issues of material fact exist. There are differing interpretations of the facts. There are three different differing and conflicting fact patterns and the law turns on which of these fact patterns you apply. The first fact pattern is a case in which Gregory Dillon worked for nearly a year as an asylum officer. He was a probationary employee and during that time he received mostly positive feedback. He didn't receive any written formal written feedback and then he spoke out against what he perceived as discrimination against Latinos and on the very last day of his probationary period he was fired. Well now what was the discrimination against him individually as opposed to what he perceived to be a policy of discrimination in terms of running the office? Well the discrimination would be that he was retaliated against personally. He was fired after he spoke out about this discrimination. Well now is that a protected ground under the statute? Your Honor it is because that's an employment practice that would be in a discriminatory employment practice which is protected under Title VII. Was he compelled to do anything that was unlawful? Was Mr. Dillon compelled to do anything unlawful? As a condition of his employment? Well in I believe that his feeling was that he was being compelled to discriminate as a function of his employment with the asylum office. I don't know if it rose to the level of being unlawful but I would say ethical. Well isn't that your basic position that he objected to unlawful conduct and therefore was retaliated against? Yes. Yes. I'm sorry let me rephrase it. It was the discrimination which he opposed was unlawful and he had an ethical basis. He felt he had an ethical duty to oppose such conduct. How did he speak out? Well the examples that are cited in the record include him talking to a former training officer asking questions about that which was later he found out that was cited as one of the examples that the office gave for him being insubordinate. Was there an established chain of command? Yes there was. Did he observe it? Well like I said as I was beginning there are different ways that the facts are presented in this case and Mr. Dillon's account of the facts is that he did normally follow the normal chain of command. In one instance he contacted a training supervisor and he never knew that that was unacceptable because at the end of his training at the Fuddick Center he was told by this advisor if you ever have any questions call me and so that's what he did. But overall Mr. Dillon did follow the normal chain of command. Counselor you're down to four minutes you may or may not wish. I'll turn it over to co-counsel. Thank you counsel. Thank you Your Honors. I will be addressing the performance appraisal issue. The performance appraisal here is important because it would constitute key evidence in the underlying discrimination claim. A positive performance appraisal would support Mr. Dillon's claim that he was. Excuse me did you introduce yourself for the record? I'm sorry. My name is Serena DeGrasse. Thank you. Thank you Your Honor. A positive performance appraisal would support the underlying claim that Mr. Dillon was terminated for a discriminatory reason and there are two reasons why summary judgment was not appropriate in this case as there are genuine issues of material facts and more than a shred of evidence that support Mr. Dillon's claim that he was The first reason is that taken in context the facts suggest that Mr. Dillon was denied his appraisal for retaliatory reason. Well now is there a legally enforceable right for an employee to have this document this performance appraisal? Your Honor I'm not sure if there's a legally enforceable right however he was told by the office that I mean when he was fired I mean when he was hired he knew that he was he was owed a probationary appraisal at about nine to ten months and then there's an annual appraisal and even if there was not a statutory right he was certainly told repeatedly by the office for some five months after he was terminated that he would get his appraisal that was supposed to be due at least a probationary appraisal that was due to him on March 31st and he was told until September 22nd 1999 he was still told he was going to get his appraisal and it was only after some five months after he was terminated after the letter stating he would get his appraisal then the asylum office comes back and says that it has decided not to give him an appraisal because they're now relying on the Office of Personnel Management regulations to say that a former employee is not due an appraisal. Moving back to my first argument that the facts suggest there is a retaliatory reason. After Mr. Dillon was terminated and as I've said he was due an appraisal on March 31st he was he asked for an appraisal from his then supervisor Mr. Biggs and Biggs had I'm sorry at that point Ms. Bardini had told Mr. Dillon that Biggs did not want to do the appraisal because Mr. Biggs had moved to Washington D.C. for a permanent position and yet this is contradicted by Mr. Biggs testimony that he was told by Ms. Bardini not to do the appraisal to hold on to it and that it he didn't have to worry about it and this was for both the probationary appraisal as well as the annual appraisal so two two appraisals Ms. Bardini had told Mr. Biggs not to do it while telling Mr. Dillon that it was coming to him and later saying that it was Biggs who decided not to do this appraisal and same as there are contradicting facts as to Mr. Johnston's case Biggs had asked Mr. Johnston to give him the file so that he could do the appraisal and yet Mr. Johnston testified that he had not he does not recall Mr. Biggs ever asking for the the file to do the appraisal and in fact testified that he had the impression that Biggs did not want to do the appraisal at all and so here we have contradicting facts that would present a case for trial. Counsel you're down to about two minutes to say for your counsel. Thank you very much. We'll hear from the appellee. Good morning, Your Honors. May it please the Court. My name is Steven Saltheel and I represent the appellee on this appeal. Mr. Saltheel. The issue in this case is whether the district court properly granted summary judgment on Mr. Dillon's two retaliation claims. First he asserted an opposition retaliation claim in which he claimed that he was fired for opposing what he perceived to be discriminatory policy on granting asylum applications and second he asserted a participation retaliation claim in which he claimed he was denied a performance appraisal for participating in his own Title VII proceeding. On the opposition retaliation claim there is a threshold issue as to whether Mr. Dillon's claim was justified in conduct. Section 704A of Title VII makes it unlawful to discriminate an employee because he has opposed any practice made an unlawful employment practice. Suppose there's a practice in the office of treating Hispanic applicants for asylum differently than, say, European applicants. Would that be an unlawful practice? If it was based on their race? Right. Ethnicity. Then I think it would. I don't think that the evidence supports that allegation in the record. But I think if it was expressly based on an applicant's race, I think it would probably he would be compelled to, as a condition of his employment under Moyo v. Gomez, to do things that were discriminatory. Those facts would fit within Moyo. That's correct. That's not what's in the record here. In fact, Mr. Dillon's own testimony in his deposition, when asked to describe what the discriminatory asylum policy was that he was that he opposed, which appears in the record in the Appellee's excerpts of record at pages 52 to 55, he describes in his deposition what that policy, his perceived policy, was. And he does not describe a rule or a directive or guidance or regulation. What he describes is a handful of cases in which he, in his assessment, he differed from either his supervisor or his lawyer. Is there anything in the record which suggests that he was ordered to do something contrary to law or contrary to the principle established in Moyo? I don't believe there is, Your Honor. I don't see that in the record. What I see is he differed in his assessment with his supervisor on a handful of cases. And I think it's also important to point out that asylum is based, as Your Honors are well aware, is based on the conditions existing in the country. All countries are not the same. And it's not based on race. It's based on whether a government is persecuting its people. And the more a country is persecuting its people, the more likely applicants from that country are going to be granted asylum. We submit that there's no – what is alleged and appears in the record does not rise to the level of what appeared in Moyo v. Gomez. There must be some objective evidence of a discriminatory policy and evidence that the appellant was required to carry out that policy as a condition of his employment. And that just doesn't exist in the record. The government makes a point of the fact that he wasn't a decision maker. Does one have to be a decision maker to set up Moyo? I don't believe that that's a factor. If he – even if he was not a decision maker and he was required to carry out an unlawful policy, a discriminatory policy. Suppose he only made recommendations, but he was told or encouraged to make recommendations that were themselves discriminatory. Would that fit within Moyo? If there was a policy and a guidance and a directive in which – which was truly discriminatory and which he was required to, I believe so. Can a policy be inferred from conduct even though there's not a written policy or a written directive? I don't know, Your Honor. There's no case law that we know of on that. Moyo v. Gomez, to my knowledge, has not been expanded upon. So I just don't know. Even if that was the case under the law, it doesn't exist in this case. It's just that evidence is not in the record. Counsel, what about this performance appraisal issue? Your Honor, the performance appraisal issue, I mean, he was denied a performance appraisal because he was no longer an employee. He was promised at one point after his termination, Ms. Bardini did promise to provide him with a performance appraisal, and she changed her mind based on counsel that she received that Mr. Dillon was not entitled to it because he was not an employee. The court found that that was a legitimate non-retaliatory reason, and the burden shifted to Mr. Dillon to show that that reason was pretext. He simply did not provide evidence to show that that reason was wrong. There's no evidence that as a former employee he was entitled to a performance appraisal. The one regulation that addresses the agency's obligation to provide a performance appraisal applies to an employee. It doesn't talk about former employees. And we pointed out in our brief that where a regulation does apply to a former employee, it says so expressly. Well, counsel, you heard Ms. DeGrasse's argument that a lot of this performance appraisal issue developed prior to termination and nothing happened. It was delayed. In other words, I don't think that you're responsive to the point they're making when you say that, well, he's no longer an employee there. He's not entitled to it. We understand that. But to the extent that there's a claim here, what went on? I'm not sure. Counsel did refer to a probationary appraisal. And quite frankly, Your Honor, I don't know where that appears in the record. There is no evidence in the record of a probationary appraisal. I don't know where it appears in the record that he was required to receive one. My understanding of his claim has always been that the annual performance appraisal is what he was asking for, what he was promised, and what Ms. Bardini then changed her mind about. Well, the suggestion is the breach of that promise was retaliation within the meaning of Title VII. Right. That's right. The breach of the promise to provide an annual performance evaluation. Right. And I think you need to respond to that. And I – our response to that, Your Honor, is that he – she – in the record, she stated in her declaration why she changed her mind. And that was because she received advice from counsel that he was no longer an employee. And therefore, because he was no longer an employee – she knew he was no longer an employee – because he was no longer an employee, he was not entitled to one. So they were having trouble getting it, you know, getting the supervisors to do it. So at that point, she said, don't bother. Do we know what the advice was? Simply that. I mean, she stated it in her declaration. And it was simply that he's no longer an employee, therefore, he's not entitled to one. Don't worry about it. And is that the standard policy in the agency? As far as I know and as far as that appears in the record, this – as I can see, this situation does not arise very often. There's no evidence of former employees getting or receiving performance appraisals after they leave. There is evidence in the record that performance appraisals take up to, I think, three months to prepare and deliver to the employees after the rating period is over. So at that point, Mr. Dillon was long gone. But our response to answer Judge Scanlon's question is that – to that claim is that he – she stated a legitimate reason, and then Mr. Dillon didn't provide any evidence that that reason was wrong. Or pretext. That's the issue, right? Exactly, Your Honor. All right. He filed a whistleblower administrative action, is that right? That is correct. Was – did the performance appraisal come up in that context? I don't know, Your Honor. I don't. Because that – those issues were not before the district court. There was an MSPB proceeding that I believe arose out of a whistleblower claim, and Mr. Dillon did put some testimony in the record from that proceeding. But I don't know if it was tied to the whistleblower complaint. I just don't know that. It's not in the record. And it wasn't before the district court. All right. Anything further, counsel? No, Your Honor. Thank you. We have some reserve time from the appellant side. Ms. Rao? Oh, all right. Mr. Jordan Curtis? Mr. Rao. Oh, Mr. Rao. Excuse me. Sorry. Excuse me. My name is Jordan Rao, and just to address a few concerns, Your Honors. First, with the discrimination, you talked about whether he was compelled to apply what – he actually opposed the practice, and he quite likely participated in it, too, for the one-year rule. So that was actual direct discriminatory conduct that he opposed and likely to engage in. In terms of the established chain of command, that's one area where the facts seem to conflict a lot. Mr. Dillon's facts seem to suggest that he stayed within the chain of command and dealt directly with his supervisor right above him. Sometimes the supervisors were slightly to the side of him and often with the director of the office. And the office claims that he went AWOL and talked to other supervisors in the office and the athletic trainer in Georgia, which they never gave him any indication that he couldn't contact. In terms of the performance appraisal issue – If an employer has an established chain of command, here's your immediate supervisor, here's that person's supervisor, here's the head of the unit, what obligation is there on an employer to say, and, by the way, don't go outside this? I think the employer generally has an interest in keeping matters of policy concerns in the office or within the office, trying to deal with it within there. But the point is they tried to set the facts up saying that he went far out of that chain of command, whereas he believes that he was mostly within that chain of command by dealing with supervisors that he normally would have contact with about gender issues and other cases that had relevant policy implications. Does that answer your question, Your Honor? Well, I'm not sure far outside the chain of command or good faith in this kind of circumstance counts. Explain to me why it should. Well, the only situation where he was out of that full chain of command was talking to that Georgia trainer, but that person was a trainer that his own chain of command had sent him to, and the trainer had told him that he could stay in contact, so that there was never indication to the contrary that he was outside the chain of command. So I think that that was his good faith. Thank you, counsel. Your time has expired. Before submitting the case, the court would like to express its appreciation to Dr. Jordan Curtis and her very fine students who participated today and did a fine job in oral argument. I know that in particular my colleague, Judge Hawkins, would be particularly proud of the University of Arizona and the program that we saw today. Give our best to Deema Saro. We will. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Hawkins, Selna